IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**DANNY FEBUS-VÁZQUEZ,**

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.

Civil No. 15-2131 (BJM)

**OPINION AND ORDER**

Danny Febus-Vázquez ("Febus") seeks review of the Commissioner's decision finding he is not entitled to disability benefits under the Social Security Act ("Act"), 42 U.S.C § 423, as amended. Febus asks for judgment remanding the case to the Commissioner for further proceedings. (Docket Nos. 2, 13). The Commissioner answered the complaint and filed a memorandum. (Docket Nos. 11, 16). This case is before me on consent of the parties. (Docket No. 5). After careful review of the administrative record and the briefs on file, the Commissioner's decision is affirmed.

**STANDARD OF REVIEW**

The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different

conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity ("RFC") and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work

available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

Febus has a high school degree, does not understand English, and worked from 2002 to 2009 as a heavy equipment operator. He applied for disability insurance benefits on June 20, 2011. Social Security Transcript ["Tr."] 63, 65, 368, 378-380, 385, 399. Febus claims to have been disabled since June 1, 2009 (alleged onset date) at 36 years of age[1] due to back, hand, and shoulder conditions, diverticulitis, and mental conditions, and has not worked since. Tr. 64, 290, 368, 384, 395, 398. He last met the insured status requirements of the Act on June 30, 2012 (date last insured). Tr. 395. The claim was denied initially and on reconsideration. Tr. 51, 56. A hearing before an ALJ was held on October 22, 2013. Tr. 32-45. On February 10, 2014, the ALJ found that through the date last insured, and considering Febus's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Febus could perform. Tr. 26. Febus requested review of the ALJ's decision, and on June 30, 2015, the Appeals Council denied Febus's request, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-6. The present complaint followed. Docket No. 2.

---

[1] Febus was born on February 16, 1973 (Tr. 419), and was considered to be a younger individual (Tr. 26), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

The record contains evidence of treatment for chronic sinusitis, muscle spasm, chronic lower back pain, and diverticulitis by the State Insurance Fund (Tr. 68, 388, 402, 538-548, 590-714), Dr. Rafael Mártir and the Ponce Gastroenterology Society (Tr. 70, 390, 401, 501-527), the Southern Health Care Group (Tr. 470-477, 488, 491, 493-497, 549-558), Hospital Santa Rosa (Tr. 478-482), and Hospital Episcopal Cristo Redentor (Tr. 489-490, 492, 528-537). Febus also received mental health treatment from APS Health Care of Puerto Rico (Tr. 143-156, 573-586) and Dr. Guillermo Hoyos (Tr. 715-727). Through the Disability Determination Program ("DDP"), medical consultants Dr. Luis Toro (Tr. 559-561), Dr. Jesús Soto (Dr. 297, 562-563), Dr. Héctor Cases (Tr. 564-571), and Dr. Cindy Ramírez (Tr. 292, 294-295) offered their assessments as to Febus's conditions and the medical evidence on record. The following is a summary of the medical evidence and self-reported symptoms and limitations as contained in the Social Security transcript.

*Treating physicians*

**Southern Health Care Group**

The earliest evidence for back pain that I could find dates December 29, 2004 from the Southern Health Care Group, when Febus complained of moderate lower back pain and feeling anxiety. Tr. 477. He was also examined for chronic sinusitis and chronic gastritis. *Id.*

In May 2005, Febus reported continuing to feel moderate intermittent lower back pain (Tr. 475-476). A lumbar spine x-ray revealed mild straightening of the lumbar curvature related to muscular spasm, with well-aligned and preserved vertebral bodies, disc spaces, and posterior elements. Tr. 497. Progress notes from June 2007 point out that Febus was a heavy equipment operator with radiculopathy caused by occupational work, and that he also complained that his feet hurt. Tr. 473. Febus was prescribed pain medications, anti-inflammatory drugs, and muscle relaxants for his back condition. Tr. 473-476. In progress notes of five appointments between March 2010 and October 2011, there is evidence that Febus suffered from tension headaches, colon diverticula, urinary tract infection, prostate hypertrophy, esophageal reflux, an inguinal mass, and viral inguinal warts. Tr. 549-558. He was prescribed medications, and advised about adequate foot care, to exercise three times a week as tolerated, to eat a high fiber diet, and to avoid irritating food, caffeine, cola, and chocolate. Febus was also referred for a psychiatric evaluation. *Id.*

Other evidence for this time period includes a February 2008 brain CT scan from the Hospital Episcopal Cristo Redentor radiology department, which revealed a small polyp at the left maxillary antrum. The accompanying consultation report was illegible. Tr. 489-490, 492. Febus was diagnosed with Bell's Palsy and received twelve physical therapy sessions in his face for about a month (April to May 2008). Tr. 537. After therapy, he still presented facial asymmetry in the nasal area but otherwise expressed feeling better. *Id.* The record also contains evidence of visits to that same hospital in January, February, April, and May 2011 with nausea and diarrhea (Tr. 528-534), and of a lumbosacral spine x-ray taken on August 29, 2012, which revealed straightening of normal lordosis, suggestive of a paravertebral muscle spasm, and well-preserved vertebral body heights, interspaces, and facet joints. Tr. 587.

### *State Insurance Fund ("SIF")*

Febus was treated by the SIF from 2010 to 2013. On December 4, 2010, Febus hurt his back at work while lifting a box of tiles, and went for evaluation and treatment. Tr. 185, 220, 559, 599, 616-617, 622, 657, 724. Although the progress notes are mostly illegible, Febus was treated for lumbosacral strain/spasm of the L5-S1 area. Tr. 538. This record shows that Febus felt back pain, cramping, and tingling, received physical therapy, and was prescribed pain medications, anti-inflammatory drugs, and muscle relaxants. Tr. 538, 540, 545, 594, 596, 599-601. A lumbosacral spine x-ray taken on December 6, 2010 revealed straightening of lumbar lordosis due to a spasm and spina bifida occulta involving the L5 level. Tr. 544, 610. The thoracic spine x-ray rendered normal results. Tr. 543, 613. A lumbar spine MRI performed on December 21, 2010 showed muscle spasm, a bulging disc at L4-L5 associated with mild to moderate spinal canal stenosis, a central protruded disc at L5-S1, slightly narrowed lateral foramina with enlarged joints, and a subchondral cyst at the left side of L4-L5. Tr. 542, 606. An electromyography of the inferior extremities performed on March 28, 2011 revealed bilateral L5-S1 radiculopathy. Tr. 539.

During visits, Febus was observed arriving alone and walking without difficulty, including on the day of his first evaluation. Tr. 595, 597, 602, 604, 617, 628, 651. Most times, he arrived with moderate pain (Tr. 597, 602, 604, 617, 651, 696), or intense pain (Tr. 689).

On August 11, 2011, Febus was discharged from the SIF with a partial permanent disability (9% loss of physiological functions generally in the lumbosacral area) (Tr. 237, 675, 690-691), but on appeal his case was referred back for further exams of his cervical dorsal and lumbosacral condition and of his superior extremities, and to the pain clinic for continued treatment. Tr. 217-218, 655-656.

An MRI of the cervical spine dated January 16, 2013 revealed a large posterior disc bulge with central canal stenosis and bilateral neural foramina stenosis at the C3-C4 level, and mild posterior disc bulges with mild central canal stenosis at the C4-C5, C5-C6, and C6-C7 levels. No cord compression was seen. Tr. 647. Physical evaluations dated January 9 and February 27, 2013 showed that Febus's superior and inferior limbs were normal, and that he felt moderate to intense cervical and lumbosacral pain, and had limited range of movement in those areas. Tr. 645-646, 651-652, 696, 699. A February 4 electromyography showed mild carpal tunnel syndrome in both hands, being milder in the right hand. Tr. 682. A February 28 lumbar spine MRI showed discogenic changes at the L4-L5 level associated with bulging and protruded disks, central spinal canal stenosis, L5-S1 concentric bulging disk and small central to the right protrusion, good alignment of the vertebral bodies, and no fracture or dislocation. Tr. 680. May 2013 progress notes indicate that Febus felt testicular and lower back pain. Tr. 591. June 12, 2013 progress notes indicate that Febus felt much better after having received a facet joint injection in his lower back, and felt no more testicular pain. Tr. 590.

### *Dr. Rafael Mártir-Guevara (Ponce Gastroenterology Society)*

The Ponce Gastroenterology Society treated Febus from March 2009 to September 2010 for diverticulosis. Tr. 70, 390, 401, 501-527. On March 10 2009, Febus was initially assessed to have irritable bowel syndrome (Tr. 506), but a colonoscopy performed by Dr. Rafael Mártir-Guevara ("Dr. Mártir") on April 15, 2009 (Tr. 515) and an abdomen and pelvic CT performed on August 17, 2010 at Hospital Santa Rosa[2] (Tr. 514, 521) revealed that Febus had scattered diverticulosis of the sigmoid colon with no signs of inflammation

---

[2] Febus visited Hospital Santa Rosa with acute, piercing, continuous abdominal and testicular pain, and was treated for abdominal and pelvic pain due to a left renal cortical cyst and scattered diverticulosis. Tr. 501-521.

and a left renal cortical cyst. Progress notes by Dr. Mártir are illegible. (Tr. 503-505, 522-524).

### *APS Health Care of Puerto Rico*

The record contains progress notes for seven appointments with APS Clinics of Puerto Rico, from October 2011 to August 2012. Tr. 143-156, 573-586. At the initial evaluation on October 11, 2011, Febus was diagnosed with major depressive affective disorder with economic stressors, assessed a Global Assessment of Functioning ("GAF") score of 60 (moderate symptoms), found to have capacity to consent, prescribed medications, and referred to a psychologist and a psychiatrist.[3] Tr. 155-156, 585-586.

Throughout this record, progress notes indicate that he would arrive alone to his appointments, and his general appearance was clean. He was alert, and his thought process was logical and oriented. His mood was calm. His affect, introversion, and judgment were adequate. Febus showed no signs of hallucinations, and was not considered a suicidal or homicidal risk. His GAF was 69 (some mild symptoms). He was continuously prescribed the same two medications (Bupropion and Doxepin) and found to be improving. Tr. 143-154, 573-584.

In November 2011 and March 2012, Febus stated feeling better (his GAF was 69). Tr. 149, 153, 579, 583. May 2012 progress notes indicate that Febus was not taking his medications. Tr. 147, 577. Febus further indicated in August 2012 that he would wake up irritable and nervous. Tr. 145, 575. Another medication was added to his regime and a thyroid function test was ordered.[4] Tr. 146, 576. In August 27, 2012, his GAF went back down to 60, but he was found to be improving. Tr. 574.

### *Dr. Guillermo J. Hoyos*

Dr. Guillermo J. Hoyos ("Dr. Hoyos") treated Febus from November 2012 to October 2013. There are progress notes for 10 appointments. Tr. 715-727. At the initial evaluation dated November 30, 2012, Febus expressed to Dr. Hoyos feeling depressed because of his lower back pain. His concentration was regular, but his recent and immediate

---

[3] Dr. Hilton Acosta also inquired as to medical history and main complaints, but his handwritten notes, including his own observations, are illegible. Tr. 155, 585.

[4] The English translation (Tr. 146) of Tr. 576 has "Improved'" check-marked under "PROGRESS," but the original document does not.

memory were deficient and poor. Dr. Hoyos diagnosed an anxiety disorder, with a GAF of 50, and prescribed medications. Tr. 281-284, 724-727.

Throughout this record, Dr. Hoyos found that Febus interacted adequately. He appeared anxious and depressed, but was alert, oriented, and cooperative. His affect was appropriate, and his thought process was logical, coherent, and relevant, with no suicidal or homicidal thoughts or hallucinations. In follow-up visits, his memory was "ok" but his concentration was diminished and/or poor. His judgment was at times limited, but other times adequate. His insight was poor, and at times adequate. As to his thought process, Febus's speech was logical and coherent, and his sequence of ideas were logical and organized. His response time and speed of expression were adequate. Tr. 272-284, 715-723, 726-727. Febus expressed having mood swings, being forgetful, and preferring to be alone (did not like socializing). Tr. 279, 722. Notes regarding past history, daily activities, and interpersonal relationships are illegible. Tr. 282-283, 725-726.

*Procedural History*

Febus applied for disability insurance benefits on June 20, 2011, claiming that back, hands, and shoulder conditions, and diverticulitis, along with a mental condition, limited his ability to work. Tr. 64, 368, 384.

In function reports dated July 27, 2011 and August 17, 2012 (Tr. 75-82, 404-411, 427-436), Febus reported that prior to his conditions, he could do house/yard work, socialize with friends and family, and play sports. Tr. 405, 428. His conditions affected his ability to lift heavy objects, squat, bend, stand/sit for long periods of time, walk long distances, kneel, climb stairs, and sleep. Tr. 405, 409, 428, 432-433. He could reach and use his hands, with difficulty. Tr. 433. He could walk for five to fifteen minutes at a time, with a ten minute rest period in between. Tr. 409, 434. He had difficulty grooming and dressing himself because he could not bend down, and could not drive because he felt pain and was under the effects of medications. Tr. 405, 407. Febus added that he could not flex his arms and needed help washing his back, getting dressed, and sometimes to shave when his hands were weak. Tr. 428-429. His ability to see, hear, and talk were not affected, and he did not use assistive devices to move, see, hear, or speak. Tr. 403, 410, 433. He also had difficulty remembering, finishing tasks, concentrating, understanding, and getting along with others. Tr. 409. He claimed to need help following written and verbal instructions

because he could not concentrate and was forgetful. Tr. 409, 434. He acknowledged getting along well with authority. Tr. 410. He also claimed not being able to administer funds. Tr. 407, 431.

His daily activities included watching television, spending time with his wife and children, and going to medical appointments and church. Tr. 408. His wife prepared his meals (which she had always done (Tr. 430)) and gave him his medications, at which point he would lie or sit down because he felt strong pain. Tr. 404, 428, 430. He sometimes needed to be reminded to groom himself, and his wife reminded him to take his medications. Tr. 406, 429. He would go accompanied to medical appointments, but did not drive because of pain, being under the effects of medications, and forgetting directions easily. Tr. 407, 430, 432. Stress made him anxious (Tr. 435), and he handled stress by shutting himself in his room. Febus also claimed that the change in routine due to his conditions made him sad, apathetic, unsocial, bad-humored, and aggressive. Tr. 410, 431, 432.

The DDP referred the case to Dr. Luis A. Toro-Pérez ("Dr. Toro"), psychiatrist, for a consultative evaluation. Tr. 559-561. On November 18, 2011, Febus told Dr. Toro that he had suffered a work accident in December 2010 that led him to receive treatment through the SIF up until August 2011, but that his conditions left him irritable, easily upset, anxious, sad, depressed, and at times insomniac. He sought psychiatric treatment and was able to sleep better with medications. He got along well with his wife and children, except when he was irritable. He could relate with his neighbors, and coworkers and supervisors when he worked. For entertainment, he read the newspaper, listened to the radio, visited relatives, and watched television. He took care of his needs without supervision. Tr. 559. Dr. Toro observed that Febus used a cane to walk. Tr. 560.

Dr. Toro assessed that Febus had a mood disorder secondary to his back condition with depressive features, and a GAF of 60-65. Dr. Toro found that Febus was cooperative and in good contact with reality. He was oriented as to place, person, and time. His memory for recent, immediate, and remote events was good. His attention, concentration, and retention were normal. His judgment and reasoning were not impaired. His affect was appropriate and he appeared calm. His mood was slightly depressed, and he had good insight into his condition. His speech was coherent, relevant, and spontaneous. He did not

appear to be in physical or emotional distress, and showed no signs of unusual behavior or suicidal or homicidal tendencies. Dr. Toro noted that Febus claimed to handle funds adequately and was capable of normal interpersonal relationships. Prognosis was guarded. Tr. 560.

Dr. Jesús Soto-Espinosa ("Dr. Soto"), state agency psychological consultant, reviewed the record in December 2011, and assessed that Febus had moderate, major depressive disorder, but retained the mental RFC to learn, understand, remember, and carry out simple and detailed work instructions,[5] maintain attention and concentration for two-hour periods without undue interruptions; perform as per schedule and routine; appropriately interact with supervisors, co-workers, and others; and adequately complete a normal workweek and workday. Tr. 297. Febus could also maintain regular attendance and punctuality, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them. Tr. 296. Dr. Soto also assessed that Febus's conditions caused mild restriction of activities of daily living; moderate difficulties in maintain social functioning and maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. Tr. 292-294.

Dr. Soto noted that the record showed that Febus suffered from diminished concentration and depressed mood, but that his overall memory recall and cognitive processing capabilities were adequate, with no gross cognitive deficits. He was consistently observed to be alert, coherent, and oriented. His thought process was logical and reality-based, and he showed adequate stress tolerance, impulse control, and simple understanding and follow-up on verbal commands. Tr. 297, 563. Dr. Soto further noted that Dr. Toro's opinion that Febus suffered from depressed mood and slight distractibility posed greater weight because it was well-supported and consistent with the overall evidence. Tr. 296-297.

The case was referred to Dr. Héctor Cases-Mayoral ("Dr. Cases") for a neurological evaluation. Tr. 564-571. On January 25, 2012, Dr. Cases assessed that Febus suffered from chronic cervical strain and chronic lumbosacral strain, with decreased range of movement

---

[5] Dr. Soto specified that Febus was not significantly limited in his ability to carry out very short and simple instructions, but moderately limited in his ability to carry out detailed instructions. Tr. 296.

(Tr. 566, 569), bulging disc L4-L5, with spinal canal stenosis and L5-S1 disc protrusion. Dr. Cases observed that Febus was in no acute distress. He was alert, cooperative, well-oriented, and showed no agnosia or aphasia. He was able to sit, stand, walk, lie down, and get up. Tr. 565. Febus's motor functions were good (no involuntary movements, no atrophy or fasciculations, good tone and strength). Tr. 565. Sensory functions were normal. *Id.* Reflexes were normal, except for decreased Achilles reflexes. *Id.* His extremities showed normal range of movement and adequate dexterity, and no tenderness, deformities, atrophy, or fasciculations. *Id.* His gait was normal. Tr. 567. His hand functions and strength were also normal, and he was able to do the following with both hands: grip, grasp, pinch, finger tap, opposition of fingers, button shirt, pick a coin, write. Tr. 568. Dr. Cases recommended that Febus avoid moderate to strenuous activities, and also avoid bending, straining, and prolonged sitting, standing, or walking. Dr. Cases also opined that Febus needed better pain management because his current medications did not seem to be helping with the pain. Tr. 566.

Dr. Cindy Ramírez-Pagán ("Dr. Ramírez") assessed on March 2, 2012 that Febus had the RFC to perform light work as follows: occasionally (cumulatively 1/3 or less of an 8 hour day) lifting and/or carrying 20 pounds and frequently (more than 1/3 up to 2/3 of an 8 hour day), 10 pounds; stand and/or walk (with normal breaks) for four hours; sit (with normal breaks) about six hours; do unlimited pushing and/or pulling. His postural limitations included ability to frequently climb ramps/stairs and crawl; occasionally stoop (such as bend at the waist), climb ladders/ropes/scaffolds, and crouch (bend at the knees), and do unlimited balancing. Dr. Ramírez found no manipulative, visual, communicative or environmental limitations. Dr. Ramírez further assessed that Febus's conditions could reasonably produce Febus's reported pain and symptoms, but that his statements regarding their severity were only partially credible and not substantiated by the objective medical evidence alone. Tr. 292, 294-295.

The claim was denied on March 2, 2012, with a finding that Febus could not perform past relevant work, but considering his age, education, and work experience, he had the ability to complete tasks that required less physical and/or mental effort than required in his previous job, and could perform other work, such as surveillance-system monitor, call-out operator, and assembler. Tr. 51, 285, 297-299, 301.

Febus requested reconsideration on March 21, 2012 (Tr. 305), and alleged that his conditions changed because he could now hardly stand up or sit down, was always in a lot of pain, had to be medicated constantly, and needed help to do everything. Tr. 412-413, 416. He also claimed that his depression worsened. He was always in a bad mood, everything bothered him, and he lost his concentration quickly. Tr. 412. Febus reported having no new physical or mental illnesses or conditions. Tr. 413.

Dr. E. Charles ("Dr. Charles") affirmed the initial mental RFC determination on October 12, 2012. Tr. 588.

On October 19, 2012, the claim was denied upon reconsideration, and the original determination was affirmed as written. The examiner noted that Febus did not allege or present evidence of new impairments or worsening of any previously documented impairments. Tr. 46, 56, 300.

At Febus's request (Tr. 314), a hearing was held before an ALJ on October 22, 2013. Tr. 32-45, 328. Febus and Dr. Ariel Cintrón, a vocational expert ("VE"), testified.

Febus testified that he felt pain in his lower body and neck. His medications did not help him, and he did not sleep well because of pain in his hip and right leg. Tr. 35-36. Febus added that he felt facial paralysis because of nerve pain, could not stand too much noise, and his wrists hurt. Tr. 44-45. Sometimes he felt better standing or sitting. He was discharged by the SIF, but continued to visit his general practitioner regularly. Tr. 36. He showed signs of early carpal tunnel syndrome, for which he did not receive treatment because he wasn't referred to the SIF for that condition, and had diverticulum, for which he needed surgery. Tr. 37-38. Febus further testified that he did not drive, go shopping, or do activities outside his house. He could sit for five to ten minutes and stand for five to ten minutes, but he could not walk much without having to stop and rest or lift heavy objects. Tr. 39-40.

The ALJ asked the VE whether a young person with a high school education and a vocational profile of medium and the following functional limitations could work: perform light work, alternate positions every two hours between sitting and standing while performing duties, and perform unskilled work that is simple and repetitive and that did not require serving the public. The VE answered that such a person could do light jobs that were unskilled, routine, and repetitive, such as a sub-assembler (of electrical equipment),

wireworker (of electrical and electronic components), and electrical accessories assembler I. Tr. 42-43.

Febus's attorney asked if a person that had to alternate positions every hour instead of every two hours could engage in those jobs. The VE answered that he could not in a steady manner. Tr. 43.

On February 10, 2014, the ALJ found that Febus was not disabled under sections 216(i) and 223(d) of the Act. Tr. 13. The ALJ sequentially found that Febus:

(1) had not engaged in substantial gainful activity since his alleged onset date of June 1, 2009 through his date last insured of June 30, 2012 (Tr. 15);

(2) had severe impairments: lumbosacral strain, bulging disc at the L4-L5 level with spinal canal stenosis and L5-S1 protrusion, cervical strain, diverticulosis, and a mood disorder (Tr. 15);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 16);

(4) could not perform past relevant work, but retained the RFC to perform light work as defined in 20 CFR 404.1567(b) except that he had to alternate positions between sitting and standing every two hours, and retained the ability to follow and understand unskilled simple directions and instructions that did not involve working with the public (Tr. 19, 26); and

(5) as per his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Febus could perform (sub-assembler of electrical products, wire worker, and electrical accessories assembler). Tr. 26-27.

Febus requested review of the ALJ's decision, which the Appeals Council denied on June 30, 2015, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-6. The present complaint followed. Docket No. 2.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Febus's

age, education, work experience, and RFC, there was work in the national economy that he could perform, thus rendering him not disabled within the meaning of the Act.

Febus argued that the ALJ's RFC determination was erroneous, and cited the radiological studies, and the records of the SIF, Dr. Cases, Dr. Hoyos, and Dr. Toro as evidence that Febus could not even perform sedentary work, and that he had to alternate positions every hour. Docket No. 13; p. 8, 11-13. The ALJ determined that through the date last insured, Febus retained the RFC to perform light work, except that he had to alternate positions between sitting and standing every two hours. Tr. 19. The ALJ further found that despite his depression, Febus retained the capacity to follow and understand unskilled simple directions and instructions that do not involve working with the public. *Id.*

Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of up to ten pounds, walking or standing up to six hours of an eight-hour workday, and some pushing or pulling. Light work includes sedentary work, or work that requires lifting no more than ten pounds at a time, sitting for at least six hours out of an eight-hour work day, occasional walking and standing for no more than about two hours a day, and good use of the hands and fingers for repetitive hand-finger actions. 20 C.F.R. § 404.1567(a) & (b); SSR 83-10.

The ALJ noted that, as to Febus's back condition, the record did not establish motor loss or atrophy associated with muscle weakness accompanied by sensory or reflex loss, or spinal arachnoiditis that required position or posture changes, or lumbar stenosis that resulted in pseudoclaudication. Tr. 17. As to his diverticulosis, the ALJ found no evidence of frequent exacerbations, bowel obstructions, stenosis, fistulization, perineal involvement, inflammatory processes, and other signs. *Id.* The ALJ discarded that Febus suffered from severe conditions in the shoulders and arms and limitations due to Bell's palsy, finding that the record was devoid of evidence to support such an allegation, citing Dr. Cases's evaluation and an electromyography performed on February 2013 that showed that Febus had normal hand function, and the Hospital Cristo Redentor record that showed that the facial paralysis preceded the alleged onset date and was resolved before then, in May 2008; nor was there evidence that it limited his ability to perform work related functions. Tr. 16.

In my review for substantial evidence, I found that although Febus reported having difficulty standing up from sitting and not being able to stand or walk for long periods of

time, he could do so for short periods of time, and had no limitations using his hands or extremities. Even if Febus were limited in his ability to perform light work because it requires a good deal of walking, sitting or standing, it appears that he would still able to perform at least sedentary work. The record shows that he has no hand or finger impairments, and sedentary work does not require that he be seated for six unbroken hours without shifting position during an eight-hour work day. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

Prior to his work injury in 2010, Febus was continuously being tested by different treating sources for his lower back conditions and given medications. The Southern Health Care Group noted that his radiculopathy had occupational causes, and he was treated since 2004 with pain medications, anti-inflammatory drugs, and muscle relaxants, and later on also treated for his diverticulitis. Furthermore, he was advised as to diet and exercise. Physical therapy through the SIF was then added to his treatment regime. SIF records from 2013 contain evidence that Febus's superior and inferior limbs were normal in function, but he had limited range of movement in the cervical and lumbosacral area due to moderate to intense pain. And although the record contains evidence of carpal tunnel syndrome ("CTS") on both hands, the condition was mild. A February 4, 2013 electromyography showed no active radiculopathy, mild left CTS, and very mild right CTS. Tr. 682. Dr. Cases, who consultatively examined Febus, found that his extremities showed normal range of movement and adequate dexterity, and that his hand functions and strength were normal (he could grip, grasp, pinch, finger tap), but recommended that he avoid prolonged sitting, standing, or walking. Tr. 566-568.

The record also contains evidence that treatment and physical therapy could alleviate the symptoms. Febus would arrive to his SIF appointments with complaints of moderate pain, but was observed walking alone, unassisted, and without difficulty. June 12, 2013 progress notes indicate that Febus felt much better after having received a facet joint injection in his lower back, and felt no more testicular pain. Tr. 590.

As to mental impairments, the ALJ cited Dr. Toro's record in finding that the record showed only mild restriction in activities of daily living (Febus could take care of his personal needs without supervision); moderate difficulties in social functioning (Febus got along with his wife and children, visited relatives, and got along with coworkers and

supervisors, but was sometimes irritable and anxious and should therefore avoid work that required interacting with the public); moderate difficulties keeping concentration, persistence or pace (Febus had good memory, normal attention, concentration, and retention, did not show a disorganized thought process, and could follow simple-work-related instructions); and no episodes of decompensation (no psychiatric hospitalizations, or increased dosages of medications or of treatment). Tr. 17-18, 24. The ALJ further noted that Dr. Hoyos conservatively treated Febus, and that Febus showed signs of decreased recent and immediate memory and decreased concentration but was at all times during his appointments logical, coherent, relevant, lucid, and with rapid response and organized mental ideas. Tr. 23.

In addition to the above, I also note that the APS Health Care record shows that Febus, during his appointments, was calm, alert, logical, oriented, and with adequate affect and judgment. His GAF was generally at 69 (mild symptoms), and while medicated he showed improvement. He was irritable and nervous when not medicated. Tr. 575.

I therefore find that the record, as discussed above, substantially supports the ALJ's RFC finding.

Febus also argued that the ALJ did not properly evaluate his symptoms and subjective complaints of severe pain nor fully discuss the following factors when evaluating his subjective complaints, as per *Avery v. Secretary*, 797 F.2d 19 (1986): (1) nature, location, onset, duration, frequency, radiation and intensity of pain, (2) precipitating and aggravating factors such as movement, activity, and environmental conditions, (3) type, dosage, effectiveness, and adverse side effects of pain medications, (4) treatment for relief of pain, (5) functional restrictions, and (6) daily activities. Docket No. 13; p. 8, 10. Febus cited his testimony at the hearing and his statements to Dr. Cases and Dr. Toro as evidence that he considered his pain severe in intensity. *Id.* at 10.

As part of the lengthy RFC analysis, the ALJ addressed the *Avery* factors, including Febus's self-reported allegations of pain and limitations and longitudinal treatment record, and found that Febus's determinable impairments could reasonably be expected to cause his alleged symptoms but that his statements concerning intensity, persistence, or functionally limiting effects of pain were not entirely credible based on the record. Tr. 19-25. SSR 96-7p directs the ALJ to consider a claimant's statements regarding pain in light

of the entire record and the factors also laid out in *Avery*, and to include specific credibility findings to corroborate or discredit a claimant's pain allegations. 1996 SSR LEXIS 4 at *18-19.[6] I note that the ALJ stated that he would discuss Febus's symptoms and the physical and mental evidence in the record based on the requirements of 20 CFR 404.1529, SSR 96-4p, and SSR 96-7p, and found that he did so.

Febus claimed, in general, inability to work and perform a full range of normal daily activities. As summarized by the ALJ at pages 7 through 9 of the decision, Febus claimed to the treating and consultative physicians, and at the hearing, that he felt back pain, cramping, and tingling in the right leg associated with radiating pain in the back. He alleged inability to stoop over, limitations in his ability to lift and carry weight; that he needed to alternate positions frequently, and could not sit, stand, or walk for more than five to ten minutes at a time; and that his medications did not relief his symptoms. He also claimed poor concentration and attention, limited socialization skills, irritability, interrupted sleep patterns, forgetfulness, and sadness. Tr. 19-21.

Treating and consultative physicians found, and Febus acknowledged, that he was able to walk with some limited range of movement and perform daily activities. He received mental health treatment, and remained under pharmacotherapy throughout treatment. Treating, consultative, and self-reported records show that he was consistently stable, alert, calm, cooperative and concentrated enough to perform simple tasks, interact with other people, and sustain an ordinary routine. His moderate pain and mental conditions were continuously kept in check with medications and follow-up visits to his treating doctors. Tr. 20-23. The RFC discussion also contains numerous credibility findings when addressing Febus's disability allegations and the medical evidence, in particular finding that the pain Febus felt was not as chronic as he alleged. Tr. 25. Thus, I also find that the ALJ took into account all the *Avery* factors as discussed in this opinion.

It is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence. *See Ortiz*, 955 F.2d at 769 (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir.

---

[6] SSR 69-7p, which was in effect at the time of the filing of this complaint, was superseded by SSR 16-3p effective March 16, 2016. 2016 SSR LEXIS 4.

1987). The review of this court is limited to assuring that the ALJ "deployed the correct legal standards and found facts upon the proper quantum of evidence." *Roman-Roman v. Comm'r of Soc. Sec.*, 114 Fed. App'x. 410, 411 (1st Cir. 2004). This court is bound to uphold the ALJ's findings if it is supported by substantial evidence. *Id*. at 411. The above evidence in the record shows that there is substantial evidence from treating and non-examining medical opinions to support the ALJ's RFC finding. The function of weighing evidence and determining if a person meets the statutory definition of disability is the Secretary's, 20 C.F.R. § 404.1527(d), and, as discussed in this opinion, there is substantial evidence in the record to support the ALJ's final determination.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of September, 2017.

*s/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge